UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SALT CREEK BOATS, INC.,

        Plaintiff,

vs.                                              Case No. 8:07-cv-1772-T-27TBM

DONALD BRODEUR, individually, and
ONE 24 FOOT S/V "NAMASTE", her engines,
tackle, apparel, appurtenances, etc., in rem,

        Defendants.
_____/

## ORDER

This case was tried before the court. This court has jurisdiction, as the claim arises out of an alleged breach of an oral contract for the repair of a vessel. *Hatteras of Lauderdale, Inc. V. Gemini Lady*, 853 F.2d 848, 849-50 (11th Cir. 1988). Upon consideration of the testimony and evidence, the court finds and concludes:

This case arises from repairs performed by Plaintiff on Defendant's vessel, the "NAMASTE." The parties initially executed a written agreement for certain repairs (Pl's Ex. 2) but thereafter, a dispute arose over additional work performed by Plaintiff, whether Defendant authorized the work, and whether Plaintiff's negligent work contributed to or necessitated most of the additional work. Plaintiff brought its claims in two counts, seeking imposition of a maritime lien (Count 1) and breach of an oral contract (Count 2).

As to Count 1, in order to establish a maritime lien pursuant to 46 U.S.C. § 31342 in an in rem action, Plaintiff must prove: (1) it provided "necessaries" (2) at a reasonable price (3) to the

1

vessel (4) at the direction of the vessel's owner or agent. *Sweet Pea Marine, Ltd. v. APJ Marine, Inc.* 411 F.3d 1242, 1249 (11th Cir. 2005). Plaintiff was required to present "some modicum of evidence which compares the charges claimed with what other competitors would have charged for similar work or materials." *Sweat Pea Marine, Ltd.*, 411 F.3d at 1249. Plaintiff's evidence did not establish that its "charges were reasonably in accord with industry standards." *Id.* There was no testimony, direct or circumstantial, comparing Plaintiff's charges with industry standards. Accordingly, Plaintiff cannot prevail on Count I. *Id.*[1]

As to Count 2, the fundamental issue is whether the parties reached a meeting of the minds with respect to the alleged oral contract concerning the additional work performed. To recover on Count 2, Plaintiff must prove (1) the terms of the oral contract; (2) Defendant's breach, and (3) the reasonable value of the purported damages. *Sweet Pea Marine, Ltd.*, 411 F.3d at 1249.

Prior to executing the April 21, 2006 agreement (Pl's Ex. 2), the parties had extensive discussions over several weeks concerning the repair of the NAMASTE. The NAMASTE was no ordinary sail boat. She was built in the 1940s in Holland. Defendant completely restored her in Cocoa, Florida in 2000, spending approximately $60,000. The restoration included a mahogany deck. (Def.'s Ex. 2A). Thereafter, Defendant entrusted NAMASTE to his nephew in New Hampshire, where she was exposed to the winter elements. By all accounts, that exposure, combined with minimal maintenance, resulted in the need for repairs to the deck, and replacement of damaged mahogany strips. Defendant accordingly sought estimates from two individuals with extensive

---

[1] The court considered whether Waddington's estimate could serve as an indication of industry standards, although not urged by Plaintiff. While Plaintiff's estimate was well below Waddington's estimate, a close examination of Waddington's estimate does not reveal an hourly rate or other measure with which to compare Plaintiff's rates. Accordingly, Waddington's estimate is not persuasive evidence of an industry standard.

experience in the repair of wooden boats, Plaintiff and Charles Waddington, who ultimately testified as Defendant's expert witness.

When Plaintiff inspected NAMASTE, she was, in Craig Patterson's words, in poor condition. The photographs introduced into evidence confirm that the mahogany deck was in need of substantial refinishing and repairs. Rotting wood is clearly visible and caulking between the mahogany deck strips is missing, leaving open seams. (Pl's Exs. 1A-L).

Defendant's plan was to remove all varnish, restore and replace the seaming material, re-varnish the boat, including the deck, coaming and seats (the cockpit), reset the centerboard, adjust the floor boards and replace "a couple" of mahogany strips on the deck. Patterson told Defendant that he did not know if the damaged deck strips could be saved. After those discussions, the parties executed the April 21, 2006 agreement, agreeing on a price of $3,528, based on 72 hours at $49 per hour.[2] No pricing for materials was included. Conspicuously in the agreement are the notations "half round?" and "wood repair?" No price was included for these two items.

By virtue of the April 21, 2006 agreement, the parties reached a meeting of the mind with respect to Defendant's requested repairs to NAMASTE, with the implicit understanding that "wood repair" was an unknown until the work began and the extent of the water damage could be ascertained. The court finds that the parties had an agreement, albeit not in writing, for the repair and if necessary, replacement of damaged mahogany on the deck, at an hourly rate of $49. That the exact pricing for any wood repair was not fixed in the agreement does not negate the meeting of the minds with respect to that work, if it had ultimately been performed. Defendant certainly understood

---

[2] Defendant rejected Waddington's estimate, because Waddington proposed painting the hull which he did not want to do, and his estimate for the deck repairs and re-varnishing was twice Plaintiff's.

3

and contemplated that wood repair and replacement was a likelihood, given the poor condition of the mahogany deck, and that it was difficult, if not impossible, to estimate the extent of that work. Indeed, Waddington's estimate for stripping and refinishing the deck and cockpit, including replacing the caulking with thickened epoxy, was $7500, or nearly twice Plaintiff's estimate. Unlike Plaintiff, Waddington estimated the "[m]aterial costs depending on the extent of repairs/replacement of mahogany" at $2100, "(give or take)."

During the preliminary discussions, Plaintiff proposed the option of replacing the deck in its entirety because of its condition. Robert Goodknight prepared several estimates for replacing the deck with various finishes, all of which were rejected by Defendant. Goodknight's lowest estimate was for $7-8,000, which was more than Defendant wanted to spend. The parties ultimately agreed to try to salvage the mahogany deck by repairing the decking and replacing strips where necessary. Defendant's ultimate decision to attempt to "repair and salvage" the deck rather than replace it in its entirety is the genesis of the dispute between the parties.

It is clear that the parties understood that, because of its condition, salvaging the original deck might not be feasible. That is why Patterson's testimony that, with Defendant's agreement, he performed a test application on the bow to determine if the process would be successful, is credible. After repairs to the test area were complete, the mahogany strips lifted and separated from the sub-deck. Patterson immediately brought this to Defendant's attention. Patterson recommended removal of the mahogany deck and replacing it with a painted non-skid surface. Defendant agreed, thereby creating the oral contract Plaintiff sues on. Defendant was generally aware of the potential cost of that work by virtue of Goodknight's previous estimates. It is likewise apparent, and the court so finds, that the parties continued to operate pursuant to the general terms of their original agreement,

which recited an hourly rate of $49. The court finds that the parties entered into an oral contract for the removal of the mahogany deck and its replacement with a painted, non-skid surface, and that the work would proceed and Plaintiff would be paid on an hourly basis.

Before the work began, Defendant told Patterson that the sub-deck was in good condition, which, according to Patterson, would be expected since the restoration had only been five years before. Accordingly, before the deck was removed, the parties contemplated that the fiberglass sub-deck would be in good condition. After the deck was removed, however, it was discovered that the sub-deck had delaminated and that the sub-deck had not been properly bonded to the mahogany. According to Patterson, the mahogany virtually fell off the boat because it was not properly secured to the sub-deck. Additionally, soft spots in the sub-deck were discovered. Patterson apprised Defendant of the problems they discovered with the sub-deck. Inexplicably, that "fell on deaf ears," according to Patterson.

Defendant was at Plaintiff's yard almost on a weekly basis, sometimes daily, observing the work. Plaintiff's employees, including Goodknight, continually explained to Defendant the repairs being performed as the work progressed. Goodknight specifically explained to Defendant that he intended to grind down the delaminated areas of the sub-deck. According to Goodknight, Defendant had no problems with the plan, and remarked that he liked what he saw, and that "you guys obviously know what you are doing." Defendant never objected to the repairs and continually expressed approval of the work as it progressed. After the repairs and replacement of the deck surface was complete, Defendant inspected the work and was happy with it, according to Goodknight. It is undisputed that Defendant selected the color for the painted deck from a paint chart introduced into evidence, further confirming Defendant's agreement to the work. (Pl's Ex. 5).

Apart from the deck and cockpit work, Defendant requested additional work to be performed, which he does not dispute. This included repair and restoring the NAMASTE's tiller handle, repairs to the center board and floor boards, and repair of a hatch cover from a power boat. After all of the work was completed, Patterson met with Defendant in Plaintiff's office and Patterson presented an $18,024.00 invoice to Defendant (Pl's Exs. 6A, B). Defendant objected to this amount and offered to pay the original invoice amount, and for the additional work he authorized.

According to Patterson, they compromised and Defendant agreed to pay for the work described by Patterson but requested an itemized invoice. Defendant wrote a $2,000 check to Plaintiff toward the cost of the work. Patterson prepared a revised invoice reflecting what Defendant agreed to pay for, and mailed it to Defendant with copies of the time and material records. (Pl's Ex. 7A-L; Ex. 3A-R). Patterson never heard from Defendant again. Plaintiff's adjusted billing is for $14,767.35, less the $2,000 payment, for a net amount due of $12,767.35. According to Patterson, this represents the compromise he and Defendant agreed to. Patterson acknowledges that Defendant never agreed to a specific dollar amount.

The court rejects several of Defendant's contentions as not persuasive. First, Defendant denied ever seeing estimates from Goodknight. This is just not plausible, absent a finding that Patterson and Goodknight fabricated their testimony, a finding the court does not make. Likewise, Defendant's contention that Patterson never discussed conducting a test repair on the mahogany deck is not persuasive, considering the undisputed condition of the mahogany deck when initially inspected by Plaintiff and Waddington. Moreover, Defendant acknowledges that he inspected the work after the "test" work was done, and that Patterson showed him the wood which had "erupted."

Defendant's contention that neither Patterson nor Goodknight told him about the sub-deck

6

problems is likewise not persuasive. Finally, Defendant's position that he never expected to be charged for the work is inconsistent with his testimony that after realizing that he lost the mahogany deck, he accepted its replacement with a painted, non-skid surface and after being presented with Plaintiff's initial invoice for $18,024.00, he gave Patterson a check for $2,000 toward the work. The court finds that Defendant accepted the work and agreed to pay for it on an hourly basis. Further, he agreed to pay for the additional work on the tiller, center board, hatch cover and floor boards. Additionally, Defendant requested and agreed to pay for the seat modification, refinishing of the step area, and the re-glassing of the coaming, splash rail and radius.

Defendant's testimony that Plaintiff "ruined" the mahogany deck is rejected as unsupported by persuasive evidence. The court rejects Waddington's explanations of why the mahogany deck erupted, to the extent he attributes fault to Plaintiff for failing to seal the deck after the epoxy had been applied to the seams. Although certainly a plausible explanation for how a wood deck might erupt, Waddington acknowledged that the boat had been poorly maintained and that poor maintenance can cause splintering and lifting of wood decking. The court is persuaded by the preponderance of the evidence that poor maintenance of NAMASTE's mahogany deck, combined with the improper bonding of the deck to the sub-deck, caused the lifting or erupting of the mahogany in the test area. In sum, the court finds that the mahogany deck could not be salvaged because of poor maintenance and improper bonding to the sub-deck, rather than because of any alleged negligent work on Plaintiff's part. The deck had significant problems from exposure and water intrusion, and the sub-deck had begun to delaminate. None of this was visible from a surface inspection. Defendant certainly expected to pay a reasonable amount for the repairs, just not the amount Plaintiff invoiced him for.

The court has reviewed Plaintiff's time and material records (Pl's Ex. 3A-R), and compared those with the time records attached to Plaintiff's revised invoice. (Pl's Ex. 7A-L). The work described in the records corresponds with the work authorized by Defendant. Plaintiff's revised invoice accurately reflects the hours devoted to the work and the materials used. The revised invoice charges an hourly rate of $50, however. The only rate agreed to by Defendant was $49 per hour, as reflected in the April 21, 2006 invoice. (Pl's Ex. 2). That rate will be applied.

The court finds and concludes that Defendant breached the oral agreement between the parties by failing to pay for work he authorized. Based on that agreement, and Defendant's breach in failing to pay for the work, Plaintiff is entitled to recover damages for:

| | |
|---|---|
| 1. Hatch repair: 23.5 hours @ $49 | $1151.50 |
| 2. Original deck quote | 3,528.00 |
| 3. Additional work 161 hours @ $49 | 7,889.00[3] |
| 4. Materials | 243.35 |
| Sub total | $12,811.85 |
| Less payment | (2,000.00) |
| Total | **$10,811.85** |

Defendant has not carried his burden of proof on his affirmative defenses or counterclaim. Plaintiff did not breach the agreement between the parties. Nor was Plaintiff's repair work negligently performed. Accordingly, it is

**ORDERED** and **ADJUDGED** that Plaintiff recover damages of $10,811.85 for which let execution issue. The court reserves jurisdiction to tax costs and prejudgment interest. The Clerk

---

[3] Pl's Ex. 7-A contains an apparent mathematical error in the calculation of the charge for additional work.

8

is directed to close this case.

**DONE AND ORDERED** in Tampa, Florida, on this 9th day of February, 2010.

/s/ JH Whittemore
JAMES D. WHITTEMORE
United States District Judge

Copies to: Counsel of Record